**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**WILLIAM EUGENE WEBB,**

      **Plaintiff,**

**v.**                                    **Civil Action No. 2:09cv107
                                               Judge Bailey**

**KUMA J. DEBOO, Warden,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I.  Procedural History

The *pro se* plaintiff initiated this case on September 4, 2009, by filing a civil rights complaint against the above-named defendant pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). On September 21, 2009, the plaintiff was granted permission to proceed *in forma pauperis.*

On September 23, 2009, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time; a summons was issued that same day.  On November 24, 2009, the defendant filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. A Roseboro Notice was issued on November 25, 2009. On February 8, 2010, the plaintiff filed a document styled "Motion to Deny Defendant's [sic] and Counter-Motion for Summary Judgment."

On May 18, 2010, the undersigned issued a Report and Recommendation ("R&R"), recommending that plaintiff's complaint be dismissed; that the Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, be granted; that plaintiff's Motion to Deny Defendant's [sic] and Counter-Motion for Summary Judgment be denied; that the plaintiff's

Motion for a Calendar Call be denied; and that the plaintiff's Complaint be dismissed with prejudice for failure to state a claim upon which relief could be granted. On June 7, 2010, Webb filed his objections to the R&R.

On July 30, 2010, after a review of the R&R and objections, the Court issued an Order adopting the undersigned's recommendations. Because objections had been filed, the Court made an independent *de novo* consideration of those recommendations to which objections were filed. The remaining recommendations, to which Webb filed no objection, were reviewed using the clearly erroneous standard. The Court then concluded that the undersigned's recommendation was proper, and the plaintiff's objections failed to meet his heavy burden specifically prescribed by the Eighth Amendment. Accordingly, the Court affirmed and adopted the R&R in its entirety.

Webb then appealed the Court's Order. On appeal, Webb raised three issues: that the District Court erred by 1) finding defendant DeBoo did not violate his constitutional rights by overcrowding his place of confinement to more than 150% of its rated capacity; 2) its improper application of the incorrect standard of review and its improper findings of facts; and 3) finding that Webb's allegations regarding triple bunking did not rise to the level of an appropriate claim for relief in a <u>Bivens</u> action. In an unpublished *per curiam* opinion issued on April 15, 2011, the United States Court of Appeals for the Fourth Circuit vacated and remanded in light of <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995) and <u>Helling v. McKinney</u>, 509 U.S. 25, 33 – 36 (1993), finding that the District Court had applied the incorrect legal standard.

On May 20, 2011, the Court entered an Order of Referral, directing the undersigned to consider the record and do all things proper to determine or make recommendations for disposition, including setting forth findings of fact. In light of that directive, the undersigned ordered the defendant to file a supplemental memorandum on the sole issue of whether Webb's

complaint stated an Eighth Amendment claim that prison conditions exposed him to a substantial risk of harm.   Webb was directed to reply, but instead filed an objection to the order, along with a motion to strike it.  The defendant complied with the Order, filing its Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment with a Memorandum of Law in Support.  The Court overruled Webb's objection, denied his motion to strike, and ordered him to respond to the defendant's Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and extending the time in which he could do so until September 20, 2011. Subsequently, Webb sought and was granted a further extension of time in which to respond, until November 8, 2011. By Order entered on September 27, 2011, the defendant was directed to file a supplemental response, and she did so on October 18, 2011**.**  On November 14, 2011, Webb filed his reply, titled Reply to Defendants' [sic] Supplemental Memorandums to Deny Their Motion to Dismiss or Motion For Summary Judgment, along with a Motion to Compel Postage, Status Update, and Motion to File a Voluminous Reply to Defendant's Two Supplemental Responses.  By Order entered on November 23, 2011, the defendant was directed to provide a more complete response within seven days, and did so on November 30, 2011.  On December 19, 2011, plaintiff replied.

**A.  Summary of Facts of Case**

At the time he filed his complaint, plaintiff was a federal prisoner incarcerated at FCI Gilmer, located in Glenville, West Virginia. Plaintiff's complaint alleged that the defendant was deliberately indifferent to the cruel and unusual punishment she subjected him to, when she forced him to live under inhumane conditions caused by triple bunking, in violation of his

constitutional rights, a Federal Bureau of Prisons ("BOP") program statement, and state and federal regulations, including fire and building codes.[1]

More specifically, the plaintiff's complaint alleged that his Eight Amendment rights were violated, when the defendant permitted the existence of, *inter alia,* severe overcrowding, causing unsanitary conditions; the spread of disease; frustration among inmates over lack of access to basic services and a concomitant increased risk of violence; and lack of access to medical care at the prison..

The Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment, contended that Webb's allegation that defendant DeBoo's policy of triple-bunking violated his constitutional rights lacked merit; DeBoo had no personal involvement in the facts and circumstances surrounding plaintiff's claims and must be dismissed from the action; DeBoo was entitled to qualified immunity; and any Bivens claim against her in her official capacity was barred by sovereign immunity.

In response, plaintiff's Motion to Deny Defendant's [sic] and Counter-Motion for Summary Judgment reiterated his allegations, provided additional case law, and honed his triple-bunking/overcrowding claim, alleging that it caused one to two emergency lockdowns weekly, as a result of friction and fights between inmates and staff from inmate competition for access to limited basic resources, which contributed to heightened tensions, frustration and an increase in acts of aggression. Further, plaintiff alleged that a lack of seating room in the inmate dining hall resulted in a serious confrontation on November 28, 2009 between black and Spanish inmates, nearly causing a full scale riot. He contended that because of this and other similar dining hall incidents, the facility's operation schedule was off, meals took twice as long, and as a result,

---

[1] Plaintiff sought one million dollars in damages and declaratory relief.

hourly controlled movement, including general work call, facilities work call, and educational hourly classes regularly were fewer and delayed. Webb also alleged that overcrowding had affected the delivery of medical care, contending that for the prior year, since the Medical Department revised its sick call system, inmates had to wait days and even weeks for an initial evaluation by a medical practitioner, regardless of their condition. He also alleged there was currently a "tuberculosis epidemic" at the facility, and that the death rate at FCI Gilmer is much higher, *per capita,* in comparison to other prisons, both BOP and state facilities, because of staff's inability to effectively and quickly diagnose and treat these often documented serious conditions. In support of his claims, Webb submitted his own affidavit and joint declarations of several other inmates housed in three man cells, reiterating his allegations regarding overall conditions at FCI Gilmer.[2]

## B.  Defendant's Post-Remand Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Dkt.# 54)

Plaintiff cannot demonstrate a substantial risk of serious harm as a result of the alleged overcrowding, because since May 16, 2011, he is no longer incarcerated at FCI Gilmer.

Even if plaintiff had not been transferred from FCI Gilmer, his claim of a constitutional violation lacks merit, because the conditions he complained of at the facility were caused by reasons other than overcrowding or poor plumbing and have already been rectified.

Plaintiff's claims are unsupported and lack merit.

There is no epidemic of tuberculosis ("TB") at FCI Gilmer; plaintiff's claim to the contrary lacks merit.  Likewise, plaintiff's claim that inmates who arrive at FCI Gilmer are not appropriately screened for TB is without merit.

---

[2] The joint declarations are exact copies of the plaintiff's affidavit and are signed by inmates housed in the A-2 Unit, B-1 Unit, B-2 Unit, and C-1 Unit.

Plaintiff's claim that the death rate, *per capita*, is higher at FCI Gilmer than any other BOP or state facility is unsupported and lacks merit.

Plaintiff's claims for injunctive relief are moot, because he has been transferred from FCI Gilmer and is no longer subjected to any allegedly unconstitutional conditions.

Plaintiff's <u>Bivens</u> claims should be dismissed for failure to exhaust his administrative remedies.

## C. Defendant's Response to the Court's September 27, 2011 Order Directing a Supplemental Response (Dkt.# 69)

Plaintiff's allegation that FCI Gilmer's death rate is higher, *per capita*, than any other facility is completely lacking in merit and should be dismissed.  A comparison of FCI Gilmer's death rate with other similar FCIs reveals its death rate is consistent with those facilities' death rates and is even lower than some of the FCIs most comparable to it.  The defendant attaches a sworn declaration by the BOP's Health System Analyst, to support her position.

Defendant denies that there is currently a TB outbreak at FCI Gilmer and that inmates have not been appropriately tested. She attaches a sworn declaration by FCI Gilmer's Infectious Disease Nurse, admitting that FCI Gilmer did have some TB cases, first diagnosed in July 2009, that began with an inmate with active TB, whose diagnosis was originally missed, who transferred in from the state correctional system.  That inmate was not diagnosed until he had already been moved into the facility's general population.  Once diagnosed, he was quickly and appropriately quarantined and treated.   Some inmates who were exposed to him did develop TB. All other exposed individuals, or those who were identified as being at-risk were tested and given appropriate treatment. Plaintiff was in neither of those groups; had a previous history of a positive PPD test with latent TB treatment well before he ever arrived at FCI Gilmer; and had negative chest x-rays on March 10, 2009 and May 12, 2011.

Plaintiff's claim must be dismissed; he cannot demonstrate he was subjected to a substantial risk of serious harm because he had already been exposed to TB before he arrived at FCI Gilmer and he does not have active TB. Moreover, he cannot show that defendant ever knowingly and unreasonably disregarded an objectively intolerable risk of harm to him. Finally, defendant is a non-medical administrator who is entitled to rely on the expertise of the prison's medical staff.

**D. Plaintiff's Reply to Defendant's Supplemental Memorandums to Deny their Motion to Dismiss or Motion for Summary Summary Judgment (Dkt.# 81)**

The plaintiff reiterates the claims made in his original complaint and generally refutes the defendant's responses.

**E. Defendant's Response to the Court's November 23, 2011 Order (Dkt.# 85)**

The defendant reiterates her claims regarding that plaintiff's allegations about the death rate *per capita* at FCI Gilmer and its alleged TB epidemic with more specificity, again asserting that plaintiff's claim regarding the death rate at FCI Gilmer is meritless. Defendant avers that FCI Gilmer averages 1.33 deaths per year with an inmate population of over 1,700, far below the eight deaths per one thousand persons in the general U.S. population during the calendar year 2007, the last year for which the CDC website reports final data.

The defendant insists that plaintiff's claims regarding a TB outbreak are without merit as well. She denies that there was a TB epidemic at FCI Gilmer, and provides more detail regarding how the TB cases actually occurred. Defendant avers that besides the original inmate who was initially misdiagnosed but later found to be infected, three other inmates who were exposed to him later tested positive for TB via sputum cultures; five others were suspected of being infected based on x-rays, but were asymptomatic and were not sputum culture-tested. All eight were treated with the drug regimen for TB; only the three positive culture cases were

confirmed cases. Defendant asserts that the situation was handled immediately and appropriately when it was discovered. Defendant avers that the most that can be said is that the medical staff was negligent in misdiagnosing the original inmate's infection, and denies that this rises to the level of a constitutional violation. She again denies that she knowingly and unreasonably disregarded an objectively intolerable risk of harm to the plaintiff and/or that she would continue to do so, had plaintiff not already been transferred from the facility.

Defendant asserts that the only claim plaintiff has fully exhausted is his triple-bunking claim and that the issues regarding the TB "epidemic" and the higher-than-average death rate at FCI Gilmer are unrelated to the triple-bunking and overcrowding allegations alleged in plaintiff's original complaint. Moreover, the three confirmed and five suspected TB cases were not a result of overcrowding that plaintiff alleges is a result of triple-bunking. Defendant again asserts that plaintiff's allegations should be dismissed.

## F. Plaintiff's Reply to Defendant's Response to the Court's November 23, 2011 Order (Dkt.# 88)

Plaintiff generally reiterates his claims and attempts to refute the defendant's arguments in response, attaching a sixty-page D.O.J./B.O.P. Patient Care Program Statement. In response to the defendant's argument that he neither sought nor was granted permission to amend his complaint by adding new claims, he denies that his February 8, 2010 response (Dkt.# 26) to the defendant's motion to dismiss raises new claims. Rather, he argues, his later-raised allegations all flow from his original claim of triple bunking being a violation of constitutional rights, because overcrowding affects every facet of a prisoner's life.

Plaintiff alleges that the defendants "provably admit" that the death rate at FCI Gilmer is higher *per capita* than that of "most other facilities" and that seizes on the fact that the defendant concedes that the TB outbreak did occur while plaintiff was at the facility.

Plaintiff contends that defendant "throughout the time period in question, did knowingly, recklessly with wanton deliberate indifference totally disregard an objectively intolerable number of risk of harm [sic] to the plaintiff, and if [plaintiff had not been] not transferred she would have continued to do so."

Plaintiff concedes that his claim for injunctive relief is now moot, given his transfer out of FCI Gilmer.

## II. Pertinent Case Law

In general, the Eighth Amendment prohibits "cruel and unusual punishment." Farmer v. Brennan, 511 U.S. 825 (1994). The cruel and unusual punishment clause of the Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See Wilson v. Seiter, 501 U.S. 294 (1991).

The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 321-22 (1986); Estelle v. Gamble, 429 U.S. 97, 103 (1976) (*quoting* Gregg v. Georgia, 428 U.S. 153, 173 (1976)). Accordingly, under the Eight Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 753 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), *quoting* Hudson v. Palmer, 468 U.S. 517, 526-27 (1984). It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." Helling v. McKinney, 509 U.S. 25, 33 (1993) *quoting* Youngberg v. Romeo, 457 U.S. 307, 315-316, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982). The Eighth Amendment protects against future harm to inmates, and

requires that they be furnished with the basic human needs, one of which is "reasonable safety." Helling v. McKinney, 509 U.S. 25 (1993) *quoting* DeShaney v. Winnebago County Dep't. of Social Services, 489 U.S. 189, 200 (1989).

Double or triple celling of inmates is not *per se* unconstitutional. Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991), *citing* Rhodes v. Chapman, 452 U.S. 337 (1981); Hite v. Leeke, 564 F.2d 670, 673 – 74) (temporary triple-celling not *per se* unconstitutional); Mathias v. Simpkins, No. 7:07cv-0031, 2007 WL 1577336 * 2 (W.D. Va. May 31, 2007)("It is clear that double or triple celling of inmates is not *per se* unconstitutional."); Batts v. Martin, No. 87-7554, 1987 WL 38320 (4th Cir, July 1987)(unpublished); Batts v. Martin, No. 87-7554, (1987 WL 38320 (4th Cir. July 27, 1987)(unpublished)('Double or triple celling of an inmate does not in and of itself constitute cruel and unusual punishment."); Smith v. Does, No. 5:06-cv-00065, 2009 WL 205099 *4-5 (S.D.W.Va. Feb. 6, 2009) (complaints by inmates in 12-man bubble cells that they had inadequate ventilation, no desk or chair, inadequate space between beds; inadequate head space for inmates on top bunk, poor lighting, poor inmate hygiene resulting in offensive odor in the bubble housing areas, and other complaints, were not violations of the Eighth Amendment.).

Moreover, placement in a three-man cell is not an atypical or significant hardship that would entitle the plaintiff to any Due Process protections. See Ihde v. Wallace, et al., No. 07-cv-714, 2008 WL 4643351 * 1 and 7 (W.D. Wis. March 26, 2008) (placement in triple cells is not an atypical or significant hardship as compared to the ordinary hardships of prison life and an inmate does not have a liberty interest in being moved from a three-man cell)(discussing Sandin v. Conner, 515 U.S. 472 (1995) and Bell v. Wolfish, 441 U.S. 520 (1979)).

In order to comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, *supra* at 837. Accordingly, to establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard, and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297-99 (1991). A sufficiently serious deprivation occurs when a "prison official's acts or omission...result in a denial of the minimal civilized measure of life's necessities." Id. at 298. To prove a prison "conditions of confinement" case, an inmate must either "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," or "demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." Webb v. DeBoo, 2011 U.S. App. LEXIS 7817 at 2, *quoting* Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995).

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir.2001)(internal citation omitted). Therefore, in order to establish liability in a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort

of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986).

A federal court lacks authority to "give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992) (*quoting* Mills v. Green, 159 U.S. 651, 653 (1895). A case becomes moot when the "issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Murphy v. Hunt, 455 U.S. 478, 481 (1982) (*quoting* United States Parole Comm'n v. Geraghty, 445 U.S. 333, 396 (1980). Where an inmate seeks injunctive relief from an allegedly unconstitutional prison condition, the prisoner's subsequent transfer from that prison renders the claim moot.[3]

### III.  Analysis

Here, it is undisputed that the plaintiff has alleged no personal serious or significant physical or emotional injury resulting from the challenged conditions. Shakka, *supra* at 166. As the Fourth Circuit Court of Appeals found, Webb's complaint, liberally construed, "properly states a claim that his prison's overcrowding and lack of sanitation are exposing him to a substantial risk of harm," thus satisfying the "objective" component of an Eight Amendment claim. The issue to be decided, therefore, is whether Webb can demonstrate that he was at substantial risk of serious harm as a result of his unwilling exposure to the challenged conditions. Id. In order to do so, the court must assess the seriousness of the potential harm, the likelihood

---

[3] However, a prisoner's subsequent transfer from a complained-of prison, while it moots a request for declaratory and injunctive relief, it does not moot a request for money damages. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) *quoting* Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986). Moreover, even in the absence of a showing of actual injury, a prisoner would still be entitled to nominal damages upon proof of a constitutional violation. Gray v. Spillman, 925 F.2d 90, 93 – 94 (4th Cir. 1991).

that such injury to health will actually occur, and whether the risk violates contemporary standards of decency.  See Helling v. McKinney, 509 U.S. 25, 33 – 36 (1993).

Subsequent to the filing of his complaint, Webb was transferred to another institution. Because his complaint challenges the defendant's deliberate indifference to conditions of confinement at FCI Gilmer, his complaint, to the extent that it seeks injunctive relief, is moot. Because since he is no longer housed at FCI Gilmer, he is no longer subject to the allegedly unconstitutional conditions complained of; consequently, he no longer has a legally cognizable interest in having the allegedly cruel and inhumane conditions of confinement at FCI Gilmer resolved.

However, although Webb's claims for declaratory relief should be dismissed on account of mootness, because he has also sought monetary damages, his entire case cannot be mooted and the merits of his claims must be addressed.  See Williams v. Griffin, *supra* at 823.

## Whether Overcrowding Caused by Triple-Bunking Exposed Plaintiff to an Increased Risk of Disease, Violence and Mortality

The plaintiff asserts that being housed with two other inmates in one cell constituted cruel and unusual punishment, because triple-bunking only provides 18 square feet per inmate, compared to the 27 square feet per inmate available in two-man cells.  Further, he alleged that the severe overcrowding incident to triple-bunking from FCI Gilmer's operation at 150% of its rated capacity causes or has caused:

a) several minor head injuries from inadequate head clearance in his bottom bunk, where he only had two feet of head clearance, preventing him from sitting up in bed;

b) no space for storage of inmate personal and legal materials;

c) extremely poor ventilation inside three-man cells during lock-downs;

d) insufficient number of washing machines for inmate laundering of personal items and inadequate plumbing, causing back up of raw sewage into in most housing units, flooding

the three-man cells closest to the flooding, beginning in the laundry rooms in the lower housing but also causing sewage to back up through toilets and sinks in the three-man cells, drinking fountains in the day room area, and floor drains in the common areas. Moreover, he alleges that these affected areas were seldom, if ever, properly sanitized afterwards, leading to a high number of documented staph infections and hepatitis cases;

e) insufficient inmate shower access, because each unit of three-man cells only had twelve showers, well below the BOP's regulatory mandate for housing 147 inmates, and in his own unit, there were only six functioning showers for 147 inmates; the other six had been in disrepair for over six months;

f) insufficient numbers of operable water fountains and ice machines in the three-man cell units;

g) insufficient inmate access to washing machines, because only two washing machines were available to service the needs of 147 inmates housed in each of the lower units, preventing inmates from being able to wash their own non-government-issued personal clothing, further contributing to the high infectious disease rate;

h) placement in three-man cells was used as a form of punishment for infractions of institutional rules and policies;

i) inmate competition for scarce basic resources and friction over their limited access to them caused increased risk of violence among inmates, and increased conflict with staff, resulted in more frequent lockdowns and interfered with smooth operation of the facility, affecting the provision of meals, hourly controlled movement, general work call, facilities work call, and educational classes;

k) the prison's Medical Department's revision of its sick call system in the past year caused inmates to have to wait days and even weeks to be seen, regardless of the urgency of their condition. Further, the Medical Department has been unsuccessful in combating an "epidemic" of tuberculosis at the facility; and FCI Gilmer has a higher inmate mortality rate, *per capita,* than any other BOP and state facility, because its staff is unable to timely and effectively diagnose and treat the burgeoning inmate population with serious medical conditions.

The defendant's Supplemental Motion to Dismiss, or in the Alternative, for Summary Judgment contends that plaintiff's claims lack merit; he has not exhausted his administrative remedies on any of his condition of confinement claims except for the square footage of the triple-bunking claim; there are no constitutionally-deficient conditions at FCI Gilmer; and there is no basis for his contention that defendant DeBoo knowingly and unreasonably disregarded an

objectively intolerable risk of harm. See Farmer, *supra* at 845 - 46. Defendant contends, and the record confirms that many of the complained-of conditions were not a result of overcrowding, have been rectified or were already being addressed before plaintiff filed his complaint. In support of her claims, defendant provides affidavits from various members of FCI Gilmer or BOP staff addressing each of Webb's allegations.

With regard to plaintiff's claim that triple-bunking is cruel, unusual and inhumane treatment, the only claim for which defendants allege he has exhausted his administrative remedies, it is undisputed that triple celling is not *per se* unconstitutional. Williams v. Griffin, *supra* at 824. While "overcrowding accompanied by unsanitary and dangerous conditions can constitute an Eighth Amendment violation, provided an identifiable human need is being deprived," see Wilson v. Seiter, 501 U.S. 294, 304 (1991), here, the plaintiff has not alleged that he has been deprived of any identifiable human need. He has failed to show that housing three men in one cell offends society's evolving standards of decency or that the defendant or any other prison official knowingly ignored an excessive risk to his health and safety by placing him in a three man cell, let alone that defendant DeBoo's actions or omissions resulted in a denial of the minimal civilized measure of life's necessities." Wilson v. Seiter, supra at 298.

However, the defendant's November 24, 2009 Motion to Dismiss, or in the Alternative, for Summary Judgment does admit that the federal prison population is burgeoning nationally, and that triple bunking is the result of overcrowding. (Declaration of Kuma DeBoo, Dkt.# 20-1 at 1). She maintains that the facility is able to maintain its ACA accreditation despite having more inmates that its rated bed capacity, "because of the variety of work and program opportunities which allow inmates to be out of their cells approximately 16 hours per day. (Id.). The defendant also admits that FCI Gilmer is currently operating at 150% of its rated capacity.

(Declaration of William Saylor, Director of Research, Office of Research & Development, Federal Bureau of Prisons, Dkt.# 20-2 at 1 - 3). It is undisputed that "overcrowding, with all its consequences, can reach such proportions that the impact of the aggregate effect amounts to cruel and unusual punishment. Johnson v. Levine, 588 F2d 1378, 1380 (4th Cir. 1978). However, plaintiff has not shown that he was at substantial risk of serious harm resulting from his unwilling exposure to the challenged conditions, let alone that defendant DeBoo acted with "deliberate indifference" to his health and safety. Wilson v. Seiter, *supra* at 297-99. Although plaintiff has not exhausted his administrative remedies with respect to the many other condition of confinement claims he makes, because each of them can reasonably be construed as being caused by overcrowding, they will be addressed.

With regard to Webb's specific unsubstantiated allegation that the three-man cells provide inadequate ventilation during lockdowns, the defendant maintains that even when triple-bunked inmates are confined to their cells, the ventilation is more than double that recommended by the American Correctional Association ("ACA").[4] Moreover, FCI Gilmer is both heated and air-conditioned; temperature is typically kept between 68-78 degrees. Its two large air conditioning units have never had to operate at their full capacity, even during the hottest time periods. (Dkt.# 55-4 at 1).

To the extent that plaintiff is alleging that severe overcrowding has resulted in an insufficient number of washing machines available for inmates' personal use, causing or contributing to plumbing problems, exposing inmates to disease from backup of raw sewage in cells, commodes, sinks, water fountains, drains, which were then inadequately sanitized, the

---

[4] The ACA recommends a minimum of 15 cubic feet of outside or re-circulated air per minute, per person; in a three man cell, 45 cubic feet per minute is recommended. In a ventilation survey conducted at FCI Gilmer in October 2009, approximately one month after plaintiff filed this action, revealed that every cell tested, including three-man cells, had more than double the ventilation requirement, i.e., each cell had more than 90 cubic feet of outside or re-circulated filtered air per minute, per person. (Declaration of James Greene, Safety Manager, Dkt.# 55-4 at 1).

defendant acknowledged that there were temporary issues with drainage back-up from laundry areas that affected some of the lower level areas. However, the defendant avers that the problem was not caused by inmate overcrowding. Rather, the backup was the direct result of inmates' failing to follow instructions to use only laundry detergent, rather than soap and dishwashing liquid in the washing machines, resulting in excessive soap foam which caused drain backups. By December 14, 2010, the defendant removed the washing machines from inmate common areas and now inmate laundry is done at a centralized location under staff supervision, and there have been no further plumbing backups. (Declaration of Neil Morgan, Facility Manager, Dkt.# 55-3 at 1-2). Accordingly, because the plumbing issue was not caused by overcrowding; has already been corrected, and the plaintiff cannot show he is at risk for any future harm from the issue, the undersigned finds that this issue fails to rise to the level of a <u>Bivens</u> claim. Moreover, plaintiff's claim that there are not enough washing machines available for convenient inmate use does not state a constitutional violation; he has not alleged that he has *no* access to laundry facilities, and thus he has not shown that he was denied "the minimal civilized measure of life's necessities." Such inconveniences are not atypical hardships of ordinary prison life, such that they rise to the level of a liberty interest. "'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" <u>Jones v. N.C. Prisoners' Labor Union, Inc</u>., 433 U.S. 119, 125 (1977) *quoting* <u>Price v. Johnston</u>, 334 U.S. 266, 285, 92 L. Ed. 1356, 68 S. Ct. 1049 (1948).

Defendant denies as patently untrue plaintiff's allegation that the areas affected by plumbing backups were inadequately sanitized afterwards, contending that each housing unit was provided cleaning supplies by the Safety Department, and housing unit staff was responsible for distributing the supplies to inmate orderlies. (Declaration of James Green, Safety Manager, Dkt.#

55-4 at 1-2).   The defendant also denies plaintiff's unsupported allegation that FCI Gilmer had increased rates of staph and hepatitis as a result of the plumbing issues and provides an affidavit from the prison physician, attesting to the fact that there was no increase in hepatitis or staph cases during the relevant time period; to the contrary, the rates of both staph and hepatitis remained consistent from 2005 to the present.  (Declaration of Dr. Eddie Anderson, Dkt.# 55-5 at 1-2).   The undersigned finds that plaintiff's allegations regarding staph and hepatitis are self-serving, conclusory, and so unsupported that plaintiff simply cannot show he was ever at risk of death or serious injury as a result; and this claim should be dismissed.  It does not rise to the level of a <u>Bivens</u> claim.

Defendant admits that for a time, six out of 12 showers per unit were shut down for repairs, interfering with inmate access.  However, defendant avers that the shut down was not because of any problem related to overcrowding; rather, it was a proactive $97,000 project by the BOP, begun in mid-2008 to correct a design flaw in the original shower stall construction that contributed to poor ventilation and excessive mildew buildup.[5]  (Declaration of Neil Morgan, Facility Manager, Dkt.# 55-3 at 2).  Moreover, although plaintiff may have been inconvenienced by having to wait longer to shower than he wanted to, he has not alleged that he ever had to go without a shower, and therefore cannot show that he was denied "the minimal civilized measure of life's necessities," or demonstrate a constitutional violation.   "Prisons are not required to provide, and prisoners cannot expect the services of a good hotel."  <u>Powell v. Federal Bureau of Prisons</u>, 1:08cv199, 2009 WL 3160124 *4, Goodwin, CJ (S.D.W.Va. Sep. 25, 2009).  Again, plaintiff has not alleged that he had *no* access to shower facilities, only, presumably, that he had to wait longer to obtain access.  Given that it was the defendant's attempt to improve the facility

---

[5] Half the shower stalls in each unit were torn down at a time and rebuilt with shorter walls, to permit better air flow; renovations were performed this way to correct the problem while still providing inmate access to daily showers.

that caused the temporary problem with access, plaintiff cannot establish the subjective component of an Eighth Amendment claim. The undersigned finds that this issue does not rise to the level of a <u>Bivens</u> claim.

Plaintiff's allegation that there are insufficient number of operating water fountains and ice machines in the three-man cell units is insufficiently-pled.[6] He has not alleged that he was ever denied access to either, or prevented from receiving sufficient water; accordingly, he has not alleged sufficient facts to demonstrate a constitutional violation. Further, there is no constitutional right to ice on demand.

As for plaintiff's allegation that placement in three-man cells was used as a form of punishment for infractions of institutional rules and policies, this was denied by the defendant in her affidavit attached to her original Motion to Dismiss, or in the Alternative, for Summary Judgment. In it, she states that triple-bunking is "not the result of punishment, but is necessary based on the ever increasing federal population." (Declaration of Kuma DeBoo, Dkt. 20-1 at 1). The undersigned finds that this claim does not rise to the level of a <u>Bivens</u> claim.

In response to plaintiff's allegation that inmate competition for scarce basic resources and friction over their limited access to them causes increased risk of violence among inmates and increased conflict with staff, resulting in more frequent lockdowns, disruption to the operation of the facility, affecting the provision of meals, movement, work, and classes, the defendant attaches a chart produced by the Office of Research and Evaluation with her original November 24, 2009 Motion to Dismiss, or in the Alternative, for Summary Judgment, showing that the

---

[6] Pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, "[a] pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim *showing that the pleader is entitled to relief*, and (3) a demand for judgment for the relief the pleader seeks." (Emphasis added) "And, although the pleading requirements of Rule 8(a) are very liberal, more detail often is required than the bald statement by plaintiff that he has a valid claim of some type against defendant." <u>Migdal v. Rowe Price-Fleming International, Inc.</u>, 248 F.3d 321, 326 (4th Cir. 2001) (citation and internal quotations omitted).

number of "less serious assaults" at FCI Gilmer remained relatively constant at FCI Gilmer from 2004 – 2009.[7] Her response to this allegation in her Supplemental Motion to Dismiss, or in the Alternative, for Summary Judgment does not admit or deny that there are, as plaintiff claims, one to two emergency lockdowns weekly as a result of fights between inmates and/or staff. Defendant denies plaintiff's claims about inmate frustration over limited resources such as seating in the dining hall, showers, toilets, telephones, email, mail and visits, stating that all cells have toilets, all cell blocks have showers and "inmates have ready access to all . . . amenities." (Dkt.# 55 at 9). The undersigned finds this response to be inconsistent with defendant's own admission that the facility is overcrowded and operating at 150% of its rated capacity, but despite that, finds that plaintiff has not alleged that he was ever completely denied access to any of these basic resources, and thus, that he has failed to state a constitutional violation in this regard.

To the extent that plaintiff alleges that severe overcrowding has caused the prison's Medical Department to revise its sick call system, resulting in inmates having to wait days and even weeks to be seen, regardless of their condition, and forcing them to "literally fall-out on the compound in order to receive prompt medical attention," (Dkt.# 26 at 13), petitioner has provided no evidence to support this claim, other than his own affidavit and the affidavits of other prisoners whose statements are virtual copies of his own. In his Motion to Deny Defendant's [sic] and Counter-Motion for Summary Judgment, he expands on this allegation, contending, without offering proof, that there are "documented cases of inmates [with] . . . broken bones" who have gone untreated for months; routine six-month Chronic Care evaluations have been delayed for more than a month[.]"

---

[7] Defendant does not elaborate on this chart. It is unclear whether there is any documentation to show whether there are "more serious" assaults as a result of inmate frustration over overcrowding.

In response, in its Supplemental Motion to Dismiss, or in the Alternative, for Summary Judgment, filed eighteen months after the plaintiff made his claims, the defendant provides an affidavit from the prison physician admitting that the triage system was changed, but denying that inmates are forced to wait to be examined by medical staff, regardless of their condition; averring that inmates may report a medical emergency to any staff member; asserting that inmate requests for routine sick call are evaluated by medical staff, prioritized based on the reported condition and scheduled as needed; and asserting that the prison "has a continuously revolving inmate population who come to the institution, often times, with significant health issues and many years of abusing their bodies." Plaintiff has provided no proof that he personally was ever at risk of being in need of medical care and was denied it, or was unduly impeded in receiving it, such that he was in substantial danger of serious harm. As for plaintiff's claims that other inmates were denied care, to the extent that he attempts to assert claims on behalf of others, he has no standing to do so. See Murray v. Lappin, No. 5:07cv6, 2008 WL 249167* 3 (January 29, 2008).

Plaintiff also alleges that there is an "epidemic"[8] of tuberculosis ("T.B.") at FCI Gilmer; many inmates who have never before tested positive for T.B. are now testing positive after arriving; in violation of its own policy and other unspecified health and safety codes, "new inmates are often [not] screened for T.B. [until] ten (10) months after arrival, when policy mandates imminent testing upon arrival[.]" The defendant's supplemental responses deny that there is an 'epidemic' of T.B. at the prison and the undersigned agrees that three confirmed cases as a result of a misdiagnosis and inadvertent admission of an infected inmate into the general

---

[8] "Epidemic" is defined by Merriam-Webster as 1) affecting or tending to affect a disproportionate number of individuals within a population, community, or region at the same time; 2) excessively prevalent 3) characterized by very widespread growth or extent. See http://www.merriam-webster.com/dictionary/epidemic .

population of the facility, although unfortunate, does not rise to the level of an "epidemic," let alone a <u>Bivens</u> claim. However, contrary to defendant's claim that a TB outbreak and higher death rates are not "logically related" to plaintiff's core claim of overcrowded conditions, the undersigned finds the opposite: overcrowded conditions make conditions ripe for both disease and increased death rates, under the right circumstances. However, there is simply no evidence that those circumstances have occurred here. Moreover, the evidence shows that defendant, rather than being deliberately indifferent to the TB outbreak situation, responded swiftly and appropriately, working with the Center for Disease Control ("CDC"), the BOP and the West Virginia Health Department to coordinate the appropriate quarantining and treatment of affected inmates. Plaintiff was not one of them and has produced no evidence to show that he was ever at substantial risk of harm. This claim should be dismissed.

As for plaintiff's contention that the death rate, *per capita*, is "much higher" at the prison than at any other BOP or state facility, because ever-burgeoning prison population has created delay, as shown by the new sick-call procedure, the defendant's detailed responses demonstrate that plaintiff's claim is not only completely unsupported by facts, much less the required showing that defendant is deliberately indifferent to conditions resulting in a higher-than-average death rate. The defendant's evidence shows that FCI Gilmer houses approximately 1,755 inmates; there was one inmate death at the facility in 2010 and 2009, and two in 2008, giving an average of 1.33 deaths per year, compared to the 8 deaths per 1000 persons in the general U.S. population[9] during calendar year 2007; the death rate at FCI Gilmer is similar to, or less than the death rates at three other facilities that house approximately 1,755 inmates; there are three facilities with similar numbers of inmates who have had only one, two, or three deaths within the

---

[9] This fact further undermines plaintiff's contention that the overcrowded conditions at FCI Gilmer cause increased morbidity and mortality. One would expect that in confined conditions, disease would spread faster among a population, and accordingly, the number of deaths would be greater.

same time frame; but there are two who have had more, five and six deaths, respectively. The undersigned finds that there is no merit to plaintiff's claim in this regard and that plaintiff has failed to demonstrate a substantial risk of serious harm with regard to this claim.

In sum, as stated in Wilson v. Seiter, *supra* at 304, while overcrowding accompanied by unsanitary and dangerous conditions can constitute an Eighth Amendment violation, provided that an identifiable human need is being deprived, here, plaintiff has failed to show he was ever subjected to any unsanitary or dangerous condition that rose to the level of an Eighth Amendment violation. Moreover, consistent with Zatler, *supra* at 401, plaintiff has shown no personal involvement on the part of the defendant, and since he can show no harm, he cannot prove she was causally connected to anything he alleges occurred.

### IV.  Recommendation

For the reasons set forth herein, the undersigned recommends that the defendant's Supplemental Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Dkt.# 54) and be **GRANTED** and the plaintiff's complaint be **DENIED** and **DISMISSED** with prejudice from the docket.

Further, plaintiff's pending motions to order service (Dkt.# 65), to compel postage, for status update and to file a voluminous reply to defendant's two supplemental responses (Dkt.# 80) should all be **DENIED** as moot.

Defendant's motion to seal unredacted documents (Dkt.# 70) should be **GRANTED.**

Any party may file, **within fourteen (14) days** after being served with a copy of this Recommendation, with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely**

**file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation**.  28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>U.S. v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket sheet.  The Clerk of the Court is further directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

DATED: January 6, 2012.

/s/  James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE